F. R. FRIDAY, ADMINISTRATOR OF THE ESTATE OF JACK ARMSTRONG, DE-
CEASED, v. ALONZO ADAMS, NEWTON BLAIR DULIN, JR., AND NEW-
TON BLAIR DULIN, SR.

(Filed 14 January, 1960.)

**1. Appeal and Error § 38—**

Exceptions not brought forward in the brief are deemed abandoned.
Rule 28, Rules of Practice in the Supreme Court.

**2. Pleadings § 15—**

A demurrer admits for its purpose the truth of the allegations of fact
set forth in the complaint and relevant inferences of fact necessarily
deducible therefrom, but it does not admit conclusions or inferences of
law.

**3. Same—**

Upon demurrer the complaint will be liberally construed with a view
to substantial justice between the parties and every reasonable intend-
ment must be in favor of the pleader, and the pleading must be fatally
defective before it will be rejected as insufficient. G.S. 1-151.

**4. Automobiles § 35— Complaint held sufficient to allege concurrent
negligence of defendants resulting in death of intestate.**

In this action by passenger in a car the allegations of the complaint
are held sufficient to charge concurrent negligence of defendants, the
one in driving the car at excessive speed under the circumstances and
driving without glasses when his driver's license required him to wear
them, so that he hit the rear of a truck while blinded by the lights of
an oncoming car, resulting in his losing control of his car which ran
into a ditch, resulting in the death of intestate, and negligence on the
part of the other in parking the truck on the highway at nighttime
without flares or other warning devices, and the demurrer of the owner
and driver of the truck on the ground that allegations of the complaint
disclose that the negligence of the driver of the car was the sole proxi-
mate cause of intestate's death, was properly overruled.

**5. Trial § 22a—**

On motion to nonsuit the evidence is to be taken in the light most
favorable to plaintiff giving him the benefit of all reasonable inferences
of fact.

**6. Automobiles § 43— Evidence of concurring negligence of defendants
held sufficient to be submitted to the jury.**

Evidence tending to show that intestate was a passenger in an auto-
mobile, that the driver of the car was driving without glasses when his
driver's license required him to wear glasses and that, upon passing
the crest of the hill he saw a red light ahead of him in his lane of
travel but thought it was on a vehicle rounding a curve some distance a-
way, that he was blinded by the lights of an oncoming car which the driv-
er refused to dim, did not see a truck parked on the hard surface until
he was too close to it to avoid striking it, that the right front of his car
struck the left rear of the truck as he swerved his car to the left to
avoid the truck, that the car went into a ditch causing the death of

his passenger, and that the driver of the truck had left it parked on the highway without flares and that the rear light of the truck failed to meet the requirements of statute, *is held* sufficient to be submitted to the jury on the issue of concurrent negligence of defendants.

HIGGINS, J., took no part in the consideration or decision of this case.

APPEAL by defendants Newton Blair Dulin, Jr., and Newton Blair Dulin, Sr., from *McLean, J.*, at February 1959 Civil Term, of GASTON.

Civil action to recover for alleged wrongful death of Jack Armstrong, intestate of plaintiff.

It is not controverted that on Friday, 10 August 1956, at 9:30 P. M., Jack Armstrong, the intestate of plaintiff, was riding as a passenger in 1946 Chevrolet sedan owned and operated by defendant Alonzo Adams in a southerly direction on Forbes Road, south of the city of Gastonia, when it, the said automobile, ran into and collided with the left rear portion of the 1951 GMC truck owned by defendant Newton Blair Dulin, Sr., being driven by his agent and employee Newton Blair Dulin, Jr., within the scope of his employment, as a result of which said intestate sustained fatal injuries.

Plaintiff alleges in his complaint substantially the following: That the said truck had been parked and unattended on the main paved portion of said highway, headed in a southerly direction without lights, reflectors or other warning devices to warn the defendant Alonzo Adams and others using the said highway; and that as said Adams was proceeding on his own or right side of said road in a southerly direction at a speed of sixty miles per hour, an excessive rate of speed, in violation of law, his automobile collided with the left rear portion of said truck, and, in an effort to avoid striking said unlighted truck and an oncoming northbound automobile, he swerved to his automobile's left across said highway and into a ditch, violently crushing and killing said Jack Armstrong; that at the time of said collision the defendants were successively, jointly and concurrently negligent in proximately causing the injuries (to) and death of Jack Armstrong in the following manner:

(1) That the defendant, Alonzo Adams (a) was driving his said 1946 Chevrolet sedan at a careless, reckless and unlawful rate of speed in violation of the laws of the State of North Carolina, in such cases made and provided; (b) * * * without due caution and circumspection and in such a manner as to endanger the lives of persons riding in said automobile and (c) was driving said automobile without glasses when his driver's license required that he wear glasses at all times while operating a motor vehicle, in violation of the general

statutes of the State of North Carolina; and (d) was negligent in other aspects not herein fully set forth in detail.

(2) (a) That the defendant, Newton Blair Dulin, Jr., while in the course of his employment as agent of Newton Blair, Sr., had parked the truck of the defendant, Newton Blair Dulin, Sr., on the main paved traveled portion of said highway in the night time in violation of the laws of the State of North Carolina.

(b) That said 1951 GMC truck parked upon said main traveled portion of said highway was * * * without lights, flares or other warning devices in violation of the laws of the State of North Carolina, in such cases made and provided.

(3) (a) That the gross negligence of defendants Dulin set in sequence a chain of events which concurrently with the negligence of defendant Adams resulted in the collision of the automobile of Adams and the truck of the defendants Dulin, and as a result of the concurrent negligence of the defendants, plaintiff's intestate was seriously and fatally injured as aforesaid, and (b) that the proximate cause of the fatal injuries and death of said Jack Armstrong was the concurrent negligence of the defendants herein named as herein set forth and constitute the efficient cause of the injuries and death of plaintiff's intestate.

Defendants Dulin answering the complaint of plaintiff, deny in material aspects the allegations of the complaint and (1) for further answer and defense aver, upon information and belief, among other things, that intestate of plaintiff and defendant were on a joint enterprise or mission for the common benefit or pleasure of all riding in the Adams automobile, and would be barred by the negligence of the driver; (2) and that plaintiff's intestate was guilty of contributory negligence in that he knowingly and willingly consented to ride and voluntarily rode with a negligent and incompetent driver without protest— all of which is pleaded in bar of any recovery herein.

And for a further answer, defense and counterclaim to plaintiff's complaint the defendants Dulin aver that if the death of plaintiff's intestate was caused by any negligence of these defendants, as alleged in the complaint, they aver (1) that the negligence of Alonzo Adams was a proximate cause of such death in manner set forth in detail; and (2) that any negligence of these answering defendants was insulated by the negligence of Alonzo Adams * * * in manner set forth.

Upon the trial in Superior Court plaintiff offered testimony of several witnesses.

Webb Armstrong testified in pertinent part: "* * * the deceased,

Jack Armstrong, was near 14 years * * * on August 10, 1956, the date of his death * * *"

Elizabeth Barnett Glenn testified: "I am 21 years of age. On the night of August 10, 1956, I was riding in the automobile of Alonzo Adams, and I was sitting on the front seat between Alonzo Adams, who was driving, and Jack Armstrong, who was sitting on the outside. Henry Floyd, Elizabeth Patton and Leonard Patton were in the back seat of this automobile. We were involved in an automobile accident that night. We all left home, and we came around * * * the road coming towards over on York Highway, and before we got there, it was a truck parked in the highway, and * * * it wasn't any lights on the back of it. It was a little after nine o'clock, and the night was dark. I do not know the exact speed we were making immediately before we hit the truck, but the last time I could remember and I looked at the speedometer Alonzo Adams was driving about forty miles per hour * * *." And in answer to question as to how fast he was going just immediately before the accident happened, she replied "My opinion would be still going the same speed—forty miles an hour * * * I was looking straight ahead down the road prior to the accident. I did not see any light on this side of the road immediately in front of the automobile of Alonzo Adams, except the headlights of an oncoming car. I did not see any tail lights or obstructions in the road immediately in front of the car I was riding in. We were almost on the truck when I first saw it, and I said, 'Look out, it's a truck,' * * * Alonzo Adams pulled out to his left to go around the truck. The rear left side of the truck hit the right front side of the car in which I was riding; but it struck farther from me. I don't remember what happened after we hit the truck as I was knocked unconscious * * * The road we were traveling on was a straight road with just a tiny rise in it * * * The truck was squarely in the middle of our lane when I first saw it, and it was moving. However, it wasn't moving fast * * * it looked like it was moving to me * * *."

And on cross-examination the witness continued: " * * * We were going to Filbert, South Carolina, to visit some friends on that night. Alonzo Adams was not wearing his glasses on the night in question. I did not know he could not drive except with glasses * * * prior to the accident I asked him how fast he was driving, and I looked at the speedometer and said to Alonzo 'Don't drive any faster' and he said 'All right' * * * When I first saw the truck it was moving. I never saw it parked in the road as it was moving, but not fast. It was quite a large truck. To my knowledge, it was nothing wrong with the lights on the car of Alonzo Adams. You could see ahead clearly, see a hundred yards ahead * * * . It was a big * * * truck * * * mov-

ing slowly on its right-hand side of the road * * * but I didn't see the truck until I was right on it as it was dark * * * real dark, and didn't have any lights * * * There was no reason why I couldn't have seen the truck * * *."

The witness indicated the distance as 16 feet she was from the truck when she first saw it. " * * * I did holler at him (Alonzo) when I first observed the truck, to watch out, and at that time he turned to the left. Prior to the time that I hollered * * * Alonzo Adams was driving straight down the road on the same side that the truck was driving * * * ."

Then on re-direct examination the witness continued: "Immediately before the accident we met the headlights of another car coming. The oncoming headlights were very bright, and they blinded me myself— the glare." And to the question "And is that the reason you didn't see the truck?" she replied: "Yes, I mean that's the reason I hollered at him right then, because the car was coming, and I assumed that he, you know, had already seen the truck." And continuing the witness testified: "It was a good distance from the top of the rise in the road to where the truck was * * * ." (agreed that the distance would be) "about 150 to 200 feet." Then on re-cross-examination, the witness continued: "We wasn't on the truck when we saw the lights of the vehicle coming in the opposite direction. We were, I would say, about five feet from it * * * When I observed the real bright lights of the car coming * * * I hadn't noticed the bright lights of the car as I wasn't paying direct attention to it." And on re-direct examination the witness concluded her testimony by saying: "The car we were meeting to my knowledge did not pass by us before we hit the truck. It was coming toward us, and the lights were * * * real bright, and a man pulled off the road."

The witness Leonard Patton testified: "* * * On August 10, 1956. * * * I was riding in the car with Alonzo Adams and these other folks * * * In my opinion the car * * * was being driven at about 40 to 45 miles per hour. It was a clear night and fair. The lights on Alonzo Adams' car were all right * * * The road at the point of the collision is a kind of grade in the road * * * a rise in the road back towards Gastonia. When I seen the truck, we was right up on it. I didn't see any lights on the rear of the truck. It was standing still when I seen it * * * we were meeting another coming towards Gastonia before the wreck. It passed us before the collision. We was right up on the truck when the car going north passed us * * * the car in which I was riding * * * stopped on down below the truck a piece * * * From the point of impact to the telephone pole across the road is about fifty feet * * * the truck * * * one of the stake body trucks * * * one that

you can take the side planks off and put them back on. You can make a flat out of it * * * I did not see any lights on the truck."

Then on cross-examination the witness testified: "On the night of the accident * * * he was making around 40 to 45 miles * * *. I would say you could see ahead about 75 yards * * * When I first saw the truck, we were about 30 feet or something from the truck. When I seen it, it was sitting still, not even moving * * * I didn't see anybody in the truck until after the wreck. The highway is straight * * * . Well, I think what made Alonzo Adams run into the truck, I mean it was another car coming too. We was right up on the truck when we saw the other car coming * * * When we were about 25 feet from the truck." Then on re-direct examination the witness continued: "From the point of impact to the crest of the hill * * * I believe it would be about 28 steps * * * ."

The witness M. J. Preslar testified: "I am with the State Highway Patrol * * * On the night of August 10, 1956, I investigated an automobile accident involving the truck of Blair Dulin, Sr., driven by Blair Dulin, Jr., and a vehicle operated by Alonzo Adams on the Forbes Road. I arrived there about 15 minutes till ten o'clock * * * I found certain dirt and debris on the highway * * * I always put that road as running east and west * * * a secondary road * * * but maintained by the State * * * ." Witness identified a photograph indicating the roadway where the accident occurred— which shows the high bank which goes up from the road to the yard of the house across the road, and says: "In my opinion the bank is 12 or 15 feet high above the paved portion of the highway * * * When I arrived at the scene of the accident, Dulin, Jr., and Alonzo Adams were there * * * I talked to Mr. Dulin, Jr., at the scene. He told me that he had left his sister-in-law's residence, which is the one you have got down there on the photograph on the shoulder of the highway. This is the residence across the road from where the accident occurred. He said he had been there to the house with his truck and come out of the driveway, which is a little east of the highway, and he was traveling west on Forbes Road. It is not a straight driveway. * * * he had left the residence. * * * On the back of the truck was a signal light— about a four-inch light on the chassis of the truck. The truck was a regular width truck, 96 inches wide * * * and the light was * * * approximately four feet from the end of the bed * * * under the bed of the chassis * * * The light was burning when I got there." Then over objection and exceptions by defendant these questions were asked, and answer is indicated:

"Q. What did he state then as to how the accident occurred?

"A. He said that he had parked the truck in the highway in front

of this residence of his sister-in-law and was up in the yard talking to them, and he saw the headlights of a car coming, the beam of the lights coming over the hill crest, and he went for his truck, and the collision happened.

"Q. Did he say he ran for his truck?

"A. That's what he said in the City Court. Now, this didn't come out at the scene of the accident that night.

"Q. Now, did he say whether or not he had reached his truck by the time the collision occurred?

"A. He said he had reached his truck, yes sir; he was in his truck.

"Q. Did he say whether or not he was moving or not at that time?

"A. He said that he saw the headlights of the truck * * * of a car coming over the hill crest, and he made a run for his truck and got in his truck, but the truck had never got to move."

And the witness continued: "I talked to Alonzo Adams at the scene of the wreck. He said he was traveling west on Forbes Road going to what is known on South * * * 321 South, as Ralph's barn, and he saw this one light on this truck. He said he saw the light, and a car was meeting him. He said * * * when the car met him, he struck the truck trying to miss both of them * * * I measured a little over 300 feet from the top of the hill to the point of impact. I found the car of Alonzo Adams at the foot of the hill, some 390 feet from the truck. The only indication I saw of any black marks or brakes being applied is when the car swerved to the left and swerved back to the right, in a circular motion to the right, and there was a skid mark there. Where it went off the left shoulder and it came back up on the highway, there was a black mark there, but no brake marks. I could not see any brake marks at all; it looked like a skid mark. Alonzo Adams said he wasn't even under the steering wheel. He said * * * he didn't apply any brakes at all; that his car went down there by itself. He said the impact throwed him around there, and he didn't know exactly what happened * * * The truck was not where the driveway was, but was considerably south or west of the driveway. I found the truck in a ditch, and traveling west it would have been in the righthand ditch. The rear light was burning when I came up to the accident, and I believe that the front lights were still left on too. * * * The road is straight where the accident happened * * * ."

Plaintiff also introduced as a witness the defendant Alonzo Adams, who testified substantially as follows: "* * * On the night of August 10, 1956, I was driving my automobile on the Forbes Road * * * When we topped that hill prior to the wreck, I seen a light * * * on the truck, but I thought it was going around the curve, which * * * is about 600 feet on down below back down to your right. There was a

FRIDAY *v.* ADAMS.

car meeting me, and the car wouldn't dim its lights. At the time the car passed that's when I hit the truck. When I first saw the truck I was hitting it then, and the truck was standing still. I was about 600 to 700 feet from the truck when I first saw the small light * * * I was going between 25 and 30 miles an hour immediately prior to the accident."

And in response to question as to what he heard defendant Dulin, Jr., say at City Court, the witness stated: "Well, I heard him say he was standing in the yard and he heard a car coming and he ran to the truck and he said he wasn't for sure whether he pulled off or not."

Then on cross-examination the witness Alonzo Adams continued:

" * * * I have not filed any answer denying the allegations of the complaint * * * When I first saw the light on the back of the truck * * * when I topped the hill. I did not see the light all the time while I was traveling toward the truck. I took my eyes off the light as the car just killed that little red light * * * I was blinded by the lights of the approaching car when it got close enough to me * * * I noticed at the time the car passed I was on the truck. I was blinded before I was on the truck because I kept trying to get the man to dim his lights. I did not decrease my speed, although I had seen the light of the truck some 600 to 700 feet away. When I saw the light on the truck the car was coming then * * * I was first blinded just close as the car come to me. His lights were hitting my eyes. I don't know how far I traveled while I was blinded. I traveled approximately 35 to 40 feet while blinded, in my opinion. I was something like 40 or 50 feet from the truck when I was first blinded * * * I knew there was a vehicle out in the road. At least I thought it was. The curve that I am talking about is about a mile down the hill from where the truck actually was on that night. It is probably not that far. * * * There were conditions placed on my license restricting me to drive with glasses on. On that night I was driving without glasses * * * ."

And the witness continued: " * * * The lights on the car were in good shape that night * * * I saw the truck about 600 or 700 feet away * * * I did not apply my brakes and did not have time to attempt to apply them. * * * I recall making a statement to State Highway Patrolman Preslar about the accident * * * I told him I saw the light of the truck * * * I could see a good distance with my headlights on that night— probably 800 to 900 feet straight ahead. I could see that far clearly. Visibility was good that night."

Then in response to this question "How do you account for the fact then with what you told me that you didn't see that truck until you were within thirty feet from it?"; the witness replied: "I said I didn't know whether it was a car or truck, but I saw the light."

Then defendants Dulin, reserving exception to the denial of their motion for judgment as of nonsuit, offered testimony of several witnesses including Newton Blair Dulin, Jr., who testified in pertinent part as follows: " * * * I left my truck parked in the road with motor running and lights on it * * * When I went back to the truck I knew there was something coming for I could see the gleam of the headlights shining on the sky * * * I got in the truck, let the brake off, and started on. I had a rear view mirror on my truck and I could see the car coming up on me in the mirror. After I got started just a little ways, I met a car * * * and just as the car got by me the car of Alonzo Adams hit me in the rear. At the time of the accident I had * * * one big red light on the back * * * burning * * * my left rear corner and the right side of the car were involved in the accident. I was in motion at the time.

"Where I stopped my vehicle there were only very small shoulders. I say a couple of feet. I maybe had one tire off on the shoulder."

And the witness, in response to this question, "I will ask you now if you had the lights required by the State of North Carolina on the truck?", responded: "I don't think I did. The patrolman said I didn't. I took his word for it * * * ."

The case was submitted to the jury upon these issues which the jury answered as indicated.

"1. Was the plaintiff's intestate injured and killed by the negligence of the defendant, Alonzo Adams, as alleged in the complaint? Answer: Yes.

"2. Was the plaintiff's intestate injured and killed by the negligence of Newton Blair Dulin, Jr., and Newton Blair Dulin, Sr., as alleged in the complaint? Answer: Yes.

"3. What damages, if any, is the plaintiff entitled to recover? Answer: $10,000.00."

And from judgment in accordance therewith against defendants jointly and severally, defendants Dulin except and appeal to Supreme Court and assign error.

*Oscar F. Mason, Jr., Verne E. Shive for plaintiff, appellee.*
*Garland & Garland for defendants Dulin, appellants.*

WINBORNE, C. J. Of the twenty-seven assignments of error shown in the record on this appeal, defendants Dulin, appellants, bring forward in their brief fourteen,— the others, in accordance with provisions of Rule 28 of the Rules of Practice in the Supreme Court, 221 N.C. 544 at page 562, are taken as abandoned by appellants.

The first assignment of error presented by appellants is based upon

exception to the action of the trial judge in declining to sustain their demurrer *ore tenus*.

The record shows the ground assigned for the demurrer is that the complaint does not state a cause of action against them, the defendants Dulin, in that it appears from the face of the complaint that the sole, proximate cause of the motor vehicle collision in question was the negligence of the driver of the automobile in which plaintiff's intestate was riding, and that even if defendants Dulin were guilty of any act of negligence, the same was insulated and rendered inoperative by the negligence of the defendant Alonzo Adams, driver of the car in which plaintiff's intestate was riding.

In this connection, "The office of demurrer is to test the sufficiency of a pleading, admitting, for the purpose, the truth of the allegations of the facts contained therein, and ordinarily relevant inferences of fact, necessarily deducible therefrom, are also admitted."

But the principle does not extend to admission of conclusions or inferences of law. *Ballinger v. Thomas*, 195 N.C. 517, 142 S.E. 761. See also *Buchanan v. Smawley*, 246 N.C. 592, 99 S.E. 2d 787, and cases cited.

Indeed it is provided by statute, G.S. 1-151, that "in the construction of a pleading for the purpose of determining its effect its allegations shall be liberally construed with a view to substantial justice between the parties." And the decision of this Court interpreting and applying the provisions of this statute require that every reasonable intendment must be in favor of the pleader. The pleading must be fatally defective before it will be rejected as insufficient. See *Ins. Co. v. McCraw*, 215 N.C. 105, 1 S.E. 2d 369, and cases there cited; also *Lewis v. Lee*, 246 N.C. 68, 97 S.E. 2d 469, and *Buchanan v. Smawley, supra*.

Applying these principles to the facts alleged in the complaint, admitted for the purpose, to be true, it may not be held that the allegations are so fatally defective as not to allege concurring negligence. Compare *Riddle v. Artis*, 243 N.C. 668, 91 S.E. 2d 894. Hence the ruling of the trial court in this respect was proper. Decisions cited and relied upon by defendants Dulin have been duly considered and found readily distinguishable in factual situations.

Appellants also assign as error the denial of their motions for judgment as of nonsuit at the close of all the evidence. In this respect the evidence offered is to be taken in the light most favorable to plaintiff, giving to him the benefit of reasonable inferences of fact. When so taken the evidence offered upon the trial in Superior Court is of sufficient probative value to take the case to the jury and to support

the verdict rendered on which judgment from which appeal is taken is based.

Other assignments of error, properly presented, have been given due consideration, and error for which a new trial should be granted is not made to appear.

No error.

HIGGINS, J., took no part in the consideration or decision of this case.